UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

STACEY POMPEY-HOWARD,

                    Plaintiff,

      -against-                             1:15-CV-1296 (LEK/DJS)

NEW YORK STATE EDUCATION
DEPARTMENT,

                    Defendant.

---

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Stacey Pompey-Howard commenced this action against defendant New York State Education Department ("NYSED") alleging discrimination on the basis of race and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq*., 42 U.S.C. § 1981, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. Dkt. No. 1 ("Complaint"). Presently before the Court is NYSED's motion for summary judgment. Dkt. No. 35 ("Motion"); see also Dkt. No. 35-1 ("Defendant Statement of Material Facts"); Dkt. No. 35-2 ("Defendant Memorandum"); Dkt. No. 44 ("Response"); Dkt. No. 47 ("Plaintiff Statement of Material Facts"); Dkt. No. 50 ("Reply"). For the reasons that follow, NYSED's Motion is granted.

## II. BACKGROUND

### A. Factual Background

Howard is an African-American woman who works for NYSED. Def. SMF ¶¶ 1–2; Pl. SMF ¶¶ 1–2. She began working for NYSED on April 9, 2009, as a grade 18 Senior Professional Conduct Investigator with the Office of School Personnel Review and Accountability

("OSPRA"). Def. SMF ¶¶ 2–3; Pl. SMF ¶¶ 2–3. Her job entailed "investigating allegations of teacher misconduct, gathering evidence, preparing investigative reports, interviewing witnesses, [and] assisting attorneys in preparing for administrative hearings." Dkt. No. 46 ("Plaintiff Declaration") ¶ 4.

In 2012, NYSED created the Testing Security Unit ("TSU") to investigate misconduct related to the administration of state standardized tests. Def. SMF ¶ 5; Pl. SMF ¶ 5; Resp. at 2 n.1. In April 2012, Howard applied for a promotion to a grade 23 Supervising Professional Conduct Investigator position at the TSU. Def. SMF ¶ 4; Pl. SMF ¶ 4. She did not receive the promotion, but accepted an offer for a lateral transfer to a grade 18 Senior Professional Conduct Investigator position at the TSU. Def. SMF ¶¶ 10, 14–16, 19; Pl. SMF ¶¶ 10, 14–16, 19. Howard alleges that the director of OSPRA and the TSU, Tina Sciocchetti, promised to promote her to the next available grade 23 position at the TSU as a condition of Howard's acceptance of the grade 18 position. Def. SMF ¶¶ 8, 10–11; Pl. SMF ¶¶ 8, 10–11.

The next grade 23 position opened up in August 2014, and Howard applied again for the position. Def. SMF ¶¶ 34–35; Pl. SMF ¶¶ 34–35. Of the twenty-six applicants, eight, including Howard, were selected for interviews. Def. SMF ¶¶ 35–36; Pl. SMF ¶¶ 35–36. The interviews were conducted by three supervisors, Bart Zabin, Leroy Tario, and Maria Guzman. Def. SMF ¶ 37; Pl. SMF ¶ 37. Applicants were asked a standard set of questions and the interviewers scored each applicant from one to five based on their answers. Def. SMF ¶ 38; Pl. SMF ¶ 38; Dkt. No. 35-19 ("Tario Declaration Exhibit A") at 2. The successful applicant, Keith Bergmann, obtained a score of 175—the highest of all the applicants—while Howard scored a 145. Tario Decl. Ex. A, at 1. The interview scores were tallied incorrectly, but the mistake affected

2

Bergmann and Howard's scores equally and so it did not impact them. Id.; Reply at 3 n.1; Def. SMF ¶¶ 39–40; Pl. SMF ¶¶ 39–40. The grade 23 position was offered to Bergmann. Def. SMF ¶ 45; Pl. SMF ¶ 45.

Howard believed that she was more qualified for the position than Bergmann. Pl. Decl. ¶ 22. Howard had been employed for five years at grade 18 when she applied for the grade 23 position. Dkt. No. 46-4 ("Plaintiff resume"). Before that, Howard performed investigations as a Special Agent at the Office of the Inspector General from 2005 to 2009. Id. And from 2003 to 2005, Howard was a probation officer for Albany County, though it is not clear from the record whether she performed investigative work there. Id. Howard also holds a bachelor's degree in criminal justice. Dkt. No. 46-1 ("Plaintiff Deposition") at 9:17–23. Howard admitted to having little "direct" supervisory experience. Id. at 64:18–25, 65:1–25. Assuming that Howard's time as a probation officer was applicable to the grade 23 position, she had twelve years of experience in her field. Pl. resume.

Before being hired at the TSU, Bergmann had worked at the New York State Office of Children and Family Services for almost eleven years. Dkt. No. 46-5 ("Bergman resume"). While there, Bergmann was an Investigative Auditor responsible for conducting investigations and had "significant" experience interviewing children. Id.; Def. SMF ¶ 43; Pl. SMF ¶ 43. He was later promoted to Assistant Chief of Investigations, which required him to supervise and train investigators. Id. Before that, Bergmann had four years of experience as a Child Protective Services Investigator in Rensselaer County. Id. Bergmann holds bachelor's degrees in criminal justice and sociology. Id. All together, Bergmann had fifteen years of applicable experience. Id. Ultimately, the interview committee recommended Bergmann for the position, and the decision

received final approval from Director Sciocchetti and her supervisor John D'Agati. Def. SMF

¶¶ 38, 47; Pl. SMF ¶¶ 38, 47.

Howard felt wronged by the hiring decision and stated in an email to Cassandra Allison

of Human Resources ("HR") on January 5, 2015 that "[t]he only thing that is going to make me

happy is to be rightfully promoted to my grade 23 position." Dkt. No. 35-8 ("Allison Declaration

Exhibit E") at 3. In a separate letter dated January 28, 2015 Howard said, "I will fight this

department until I receive a remedy that's delivered JUSTLY. . . . I want my promotion that was

stolen." Dkt. No. 35-10 ("Allison Declaration Exhibit G") at 2. Howard also claimed in an email

that during her interview, Tario said she was "the most qualified," and that he had previously

stated that "he could not understand how [NYSED] would not want to promote and [sic] African

American Female [sic] into a grade 23 position." Allison Decl. Ex. E, at 2. Howard also cited to

Director Sciocchetti's alleged promise to promote her to the next grade 23 position. Id. Howard

reached out to Director Sciocchetti and HR to complain about the hiring decision. Id. at 2–3; Dkt.

No. 35-5 ("Allison Declaration Exhibit B") at 1. In those emails, Howard asserted that she was

not hired for the position because of her poor relationship with another employee, Lynn

Gretschel, a grade 23 at the TSU. Allison Decl. Ex. E, at 2. Although Gretschel was not on the

hiring committee, Howard believed that Gretschel blocked her promotion. Id.; Def. SMF ¶ 37;

Pl. SMF ¶ 37. In her many emails with Allison, Howard detailed her issues with Grestchel, but

she did not claim that she lost the promotion because of race or that her issues with Grestchel

were related to race. Allison Decl. Ex. E, at 2–3; Dkt. No. 35-9 ("Allison Declaration Exhibit

F"). Howard first told Allison that she believed she was not promoted because of her race about a

month after her initial contact with HR. Dkt. No. 35-3 ("Allison Declaration") ¶¶ 21, 23–24.

4

HR opened an investigation into the hiring decision. Id. ¶ 17. During the investigation, Howard provided HR with copies of work-related emails between her and Gretschel as proof that Gretschel prevented her promotion. Id. ¶ 21. None of these emails suggest that Howard's issues with Gretschel were related to race. Id. ¶ 22; Allison Decl. Ex. G. During a phone call with another member of HR, Anne Wieske, Howard expressed a desire to file a restraining order against Gretschel. Def. SMF ¶ 90; Pl. SMF ¶ 90. Wieske asked Howard if she feared for her safety. Def. SMF ¶ 89; Pl. SMF ¶ 89. Howard responded that she was not concerned for her safety, but that she anticipated an altercation with Gretschel outside of work. Def. SMF ¶ 89; Pl. SMF ¶ 89; Pl. Dep. 79:13–25, 80:1–25. Winske asked Howard to come to her office that afternoon to discuss her concerns. Dkt. No. 35-22 ("Anne Wieske Declaration Exhibit A") at 1. At the meeting, Howard and Wieske discussed Howard's issues with Gretschel. Id. Howard left the meeting feeling that her issues had not been resolved. Id. at 3. In response, Howard called the police to the HR office to file a complaint against Gretschel and then called Wieske to inform her that she had called the police. Id. Pl. Dep. 134:2–11. When an officer arrived, Howard, Wieske, and Allison all met with him. Wieske Decl. Ex. A, at 6. The officer asked Howard whether she feared for her safety, and she replied that she did not. Id. The officer then informed Howard that the police do not normally handle such issues and suggested that the matter be handled internally through HR, but that she was welcome to file a police report if she liked. Id. HR concluded its investigation into Howard's allegations of discrimination and found that the hiring decision was not discriminatory. Allison Decl. ¶ 23.

Howard claims that she began to experience retaliation soon after she informed Allison of her belief that she did not receive the promotion because of her race. Def. SMF ¶¶ 77–78; Pl.

SMF ¶¶ 77–78. Primarily, Howard alleges that her supervisors exaggerated workplace incidents to pad her personnel file so that she could be placed on involuntary leave and forced to undergo a psychological evaluation. Resp. at 6. Howard also claims that her coworkers placed mouse droppings on her desk, slammed doors to disturb her, and that her supervisors, Tario and Gretschel, spied on her in a parking lot to catch her leaving work early. Pl. Dep. at 79:2–8, 143:5–25; Wieske Decl. Ex. A, at 2. NYSED argues that the fact that Howard would accuse her coworkers of such strange behavior is additional evidence of her erratic behavior. Def. Mem. at 10–11.

Howard alleges that in March 2015, Director Sciocchetti falsely accused her of faking an injury to get out of work. Resp. 6–7; Def. SMF ¶¶ 82–83; Pl. SMF ¶¶ 82–83; No. 35-16 ("Sciocchetti Declaration") ¶ 23; Dkt. No. 46-8 ("Medical Records") at 10.[1] Director Sciocchetti testified that Howard packed up all of her personal belongings on a Friday and subsequently failed to report to work the next week. Sciocchetti Decl. ¶ 23. When Howard returned to work, she wore a wrist splint and a shoe boot, and she filed a workers' compensation claim. Id. Howard asserts that her injuries were real. Def. SMF ¶ 82; Pl. SMF ¶ 82. But she has not disputed that she packed her desk up on a Friday and failed to report to work without explanation the following week. Resp. at 6–7. Sciocchetti also testified that on a separate occasion, Howard entered Sciocchetti's office after hours without permission and went through her personal belongings. Sciocchetti Decl. ¶ 23. Howard does not dispute that she took a personal photograph belonging to Sciocchetti from the office and made a photocopy to keep for herself. Id.

---

[1]  The page numbers for the Medical Records refer to those generated by the Court's electronic filing system ("ECF").

Some time later, Howard's supervisor, Tario, received a complaint from an assistant superintendent and a school principal about Howard's behavior during a school monitoring visit. Dkt. No. 35-20 ("Tario Declaration Exhibit B") at 1–2. Howard's job required her to conduct observations at schools to ensure compliance with state testing requirements. Def. SMF ¶ 92; Pl. SMF ¶ 92; Resp. at 6. It is undisputed that on the day of the monitoring visit Howard arrived at the school without proper NYSED identification and presented her driver's license to gain access to the building. Def. SMF ¶ 92; Pl. SMF ¶ 92; Tario Decl. Ex. B, at 1–2. The principal also stated that Howard demanded that the classroom doors be unlocked and the windows be uncovered—a testing requirement—but this was against the school's security policy. Tario Decl. Ex. B, at 2. The principal thought Howard was unprofessional and that her behavior frightened the students. Id. Howard maintains that the complaint was exaggerated and that her behavior was appropriate given the school's testing violations. Def. SMF ¶¶ 92, 94; Pl. SMF ¶¶ 92, 94. After this incident, NYSED's HR department began to consider placing Howard on leave until a psychological evaluation could be performed. Def. SMF ¶ 95; Pl. SMF ¶ 95. Howard disputes this and claims that her placement on leave was entirely attributed to NYSED's retaliation. Def. SMF ¶ 95; Pl. SMF ¶ 95.

In June 2015, Howard and Kristen Little, an attorney at the TSU, got in a shouting match. Resp. at 6. Howard alleges that the disagreement was mutual, "that Little was shouting too—*i.e*, that is was a 'shouting match.'" Resp. at 6. Howard was placed on leave pending a psychological evaluation the following day. Def. SMF ¶¶ 96–97; Pl. SMF ¶¶ 96–97. No disciplinary action was taken against Little. Pl. Decl. ¶ 25; Resp. at 6. Howard alleges that this discrepancy in punishment is evidence of retaliation. Resp. at 14. Howard was on involuntary leave for over two

months before she received the results of the psychological examination, which cleared her for work. Def. SMF ¶¶ 96–97, 105; Pl. SMF ¶¶ 96–97, 105. Following Howard's return to work, she was transferred from the TSU to OSPRA at her own request. Def. SMF ¶¶ 104–105; Pl. SMF ¶¶ 104–05.

### B. Procedural History

Howard filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on October 5, 2015, alleging discrimination and retaliation on the part of her employer. Compl. ¶ 3. Howard initiated this lawsuit on October 30, 2015. Id. She received a right-to-sue letter from the EEOC on November 30, 2015, and amended her Complaint on December 2, 2015, to reflect the receipt of that letter. Dkt. No. 11 ("Amended Complaint") ¶ 3. The Amended Complaint sets forth two causes of action under Title VII. Id. ¶¶ 26, 29. First, Howard claims that her employer failed to promote her because of her race. Id. ¶ 26. Second, she argues that her employer retaliated against her for filing a discrimination complaint with HR. Id. ¶ 29. On March 28, 2017, NYSED moved for summary judgment, arguing that Howard was less qualified than the applicant hired and that she cannot prove that retaliation was the but-for cause of any adverse employment actions. Def. Mem. at 1.

### III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  Title VII Failure to Promote

To establish a prima facie case of failure to promote under Title VII, a plaintiff must

show that:

> (1) that [s]he is a member of a protected class; (2) that [s]he applied
> for a promotion to a position for which [s]he was qualified; (3) that
> [s]he was rejected for the position; and (4) after this rejection, the
> position was filled by someone outside the protected class who was
> similarly or less well qualified than the plaintiff.

Gordon v. City of New York, No. 14-CV-6115, 2015 WL 3473500, at *7 (S.D.N.Y. June 2,

2015). A plaintiff carries "a minimal burden of proof at the prima facie stage." Pointdujour v.

Mount Sinai Hosp., 121 F. App'x 895, 897 (2d Cir. 2005). Once a plaintiff establishes a prima

facie case, "the burden shifts to the employer to articulate 'some legitimate, nondiscriminatory

reason' for its action." Lundy v. Town of Brighton, 732 F. Supp. 2d 263, 271 (W.D.N.Y. 2010)

(quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)). If the defendant

provides a legitimate, nondiscriminatory reason for the action, "the presumption raised by the

prima facie case is rebutted and drops from the case." Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

507 (1993) (internal citations omitted). Ultimately, the "burden of persuading the trier of fact that

the defendant discriminated against the plaintiff remains at all times with the plaintiff." Id.

(quoting Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

NYSED concedes that Howard has satisfied the first three prongs of the prima facie case,

so the Court will discuss only the final prong of the test. Def. Mem. at 15–16. Further, it is well

established that "a court may simply assume that a plaintiff has established a prima facie case and

skip to the final step in the [failure to promote] analysis, as long as the employer has articulated a

legitimate, nondiscriminatory reason" for its failure to promote. Howard v. MTA Metro. N. Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011). Thus, the Court now considers NYSED's legitimate, nondiscriminatory reason and Howard's attempt to show pretext.

### 1. Legitimate, Nondiscriminatory Reason and Pretext

NYSED has offered a legitimate, nondiscriminatory reason for its hiring decision: the successful candidate, Bergmann, was more qualified than Howard. Def. Mem. at 16. As noted above, he had more years of investigatory and supervisory experience than Howard. Bergmann resume; Pl. resume. And according to NYSED, Bergmann's experience interviewing children was another reason it hired him. Def. Mem. at 16. Additionally, Bergmann received a much higher interview score than Howard. Id.

Howard argues that this explanation is pretextual for three reasons. Resp. at 7–9. First, Howard asserts that she was more qualified than Bergmann. Id. at 7. Second, she claims that the questions asked during the interview were not geared toward the actual work investigators performed and that the interview scores were miscalculated. Id. at 9; Def. SMF ¶ 39; Pl. SMF ¶ 39.[2] Last, Howard claims that Director Sciocchetti promised her the promotion and that her supervisor, Tario, stated that she was the most qualified candidate. Resp. at 8. She asserts that the discrepancy between her supervisors' statements and the ultimate hiring decision demonstrates pretext. Id. at 4. None of these arguments have merit.

---

[2]  Howard is correct that the tallies of the interview score sheets were miscalculated, but this mistake was harmless error. Tario Decl. Ex. A; Reply at 3 n.1. The scores were uniformly miscalculated, and so the error had no impact on the difference in score between Howard and Bergmann. Tario Decl. Ex. A; Reply at 3 n.1.  Despite the mistake, Bergmann was still the highest rated candidate. Tario Decl. Ex. A; Reply at 3 n.1.

"Courts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001). But a court is not a "super-personnel department" and should not second guess an employer's legitimate hiring decisions. Id. at 106. To establish pretext on the basis of an employer's misjudgment of her qualifications, a plaintiff must show that her credentials were "so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Id. at 103 (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280–81 (5th Cir. 1999).

Howard's assertion that she had more "actual experience" than Bergmann is baseless. Resp. at 8. Bergmann had fifteen years of investigatory experience while Howard had twelve. Bergmann resume; Pl. resume. Howard also asserts that the cases Bergmann handled at Child Services were arguably not complex, but provides no evidence for that claim. Resp. at 10. Given their respective credentials, no reasonable juror could find that Howard was so much more qualified than Bergmann that is was unreasonable for NYSED to choose him over her. See Timothy v. Our Lady of Mercy Med. Ctr., 233 F. App'x 17, 21 (2d Cir. 2007) ("Absent a striking disparity in such credentials, one should be very hesitant to draw any inference from a battle of credentials."); Byrnie, 243 F.3d at 102–03 (finding that while the plaintiff had over twenty-one years of experience as an art teacher, that was not sufficient on its own to show that he was so superior to the selected candidate, who had only four years experience as an art teacher, as to demonstrate pretext); McGarty v. City of New York, No. 12-CV-2813, 2014 WL 4626019, *8–9,

15 (S.D.N.Y. Sep. 16, 2014) (refusing to find pretext based on a comparison of qualifications where an attorney applying for a promotion was passed over in favor of younger candidates with fewer years of experience).

Howard argues that the interview questions asked were not related to the job actually performed and favored skills not listed in the job posting. Resp. at 3–4, 8. But Howard admits that grade 23 investigators are at least sometimes expected to supervise employees and interview children. Resp. at 9. It was therefore NYSED's prerogative to use interview questions that favored applicants with supervisory experiences even if the position required only the supervision of one other employee. See Byrnie, 243 F.3d at 103 ("The court must respect the employer's unfettered discretion to choose among qualified candidates" (quoting Fischbach v. D.C. Dep't of Corrs., 86 F.3d 1180, 1183 (D.C. Cir. 1996))). And even if investigators rarely interviewed minors, the Court cannot disturb NYSED's decision to ask about this experience in interviews. Id. These questions do not suggest any discriminatory motive on the part of the NYSED, and the Court cannot dictate what kinds of experience an employer should favor. See Jimenez v. City of New York, 605 F. Supp. 2d 485, 525 (S.D.N.Y. 2009) (noting that employers may "decide which types of credentials are of the most importance for a particular job, and courts defer to . . . employers to select what criteria are important to them when evaluating the issue of pretext"). Howard has thus failed to rebut NYSED's legitimate nondiscriminatory reason based on her credentials or the interview questions asked.

Nor can Howard show pretext by pointing to Dr. Sciocchetti's promise to Howard that she would receive the next available grade 23 position and Tario's statement that the Howard was "the most qualified applicant." Resp. at 8. The discrepancy between her supervisors'

statements and the ultimate hiring decision presents a potential weakness in NYSED's legitimate, nondiscriminatory reason. But absent other evidence of pretext, Howard's argument that her supervisors changed their minds about the promotion because of her race is mere speculation. See Dismuke v. Rockford Hous. Auth., No. 98-CV-50016, 2000 WL 516198, at *6 (N.D. Ill. Apr. 25, 2000) (holding that a promise to promote was too speculative to show pretext where there was no evidence as to why the supervisor changed his mind). There is no reason to believe that NYSED's failure to follow through on its promise to promote undermines the stated nondiscriminatory reason for its hiring decision: that based on his interview and credentials, Bergmann ended up being the best candidate for the job. See Lane v. Terry, No. 08-CV-3781, 2010 WL 2721896, at *16 (N.D. Ga. June 4, 2010) (finding that an employer's failure to follow through on a promise for a permanent position was not evidence of pretext where the plaintiff failed to actually rebut the defendant's proffered legitimate, nondiscriminatory reason), adopted by 2010 WL 2721536 (N.D. Ga. July 7, 2010). Finally, the fact that Tario thought that Howard was the most qualified candidate is not sufficient to show pretext. Tario was only one of three persons on the interview committee, so his statements are not inconsistent with the ultimate hiring decision. Resp. at 8; Tario Decl. Ex. A, at 2–5, 54–57;[3] see also Maye v. Gonzales, No. 00-CV-0271, 2005 WL 3544292, at *8 (D.D.C. Dec. 27, 2005) (holding that the fact that one supervisor thought that the plaintiff was qualified for a promotion was not enough to show pretext).

---

[3] The page numbers for Tario Declaration Exhibit A refer to those generated by ECF.

**B. Title VII Retaliation**

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) she was thereafter subjected to an adverse employment action; and (4) there was a causal connection between her protected activity and the adverse action. Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007). A plaintiff carries "a minimal burden of proof at the prima facie stage." Pointdujour, 121 F. App'x at 897. Once a plaintiff establishes a prima facie case, the burden shifts to the "employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). "Finally, if the defendant carries his burden[,] 'the presumption of retaliation dissipates' and the plaintiff must demonstrate that the legitimate reason offered is mere pretext for retaliation." Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 238–39 (N.D.N.Y. 2010) (quoting Hicks v. Baines, 593 F.3d 159, 164–65 (2d Cir. 2010)). NYSED concedes that Howard has satisfied the first two prongs of the test, so the Court will start by discussing whether Howard suffered an adverse employment action.

*1. Adverse Employment Action*

To establish an adverse employment action for purposes of Title VII retaliation, a plaintiff must show that her employer engaged in action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" Hicks, 593 F.3d at 165 (quoting White, 548 U.S. at 67). "'Context matters,' as some actions may take on more or less

15

significance depending on the context." <u>Tepperwien v. Entergy Nuclear Operations</u>, 663 F.3d 556, 568 (2d Cir. 2011) (quoting <u>White</u>, 548 U.S. at 69).

At least one court in this circuit has held that being placed on involuntary leave pursuant to Section 72 of New York Civil Service Law constitutes an adverse employment action for purposes of retaliation. <u>Flynn v. N.Y. State Div. of Parole</u>, 620 F. Supp. 2d 463, 495 (S.D.N.Y. 2009). NYSED concedes that "[t]here is a question as to whether involuntary leave pursuant to New York Civil Service Law section 72 constitutes an adverse employment action," Def. Mem. at 19, but NYSED argues that based on the facts in this case, Section 72 leave is not an adverse employment action. <u>Id.</u> The Court need not decide this issue. Even if Howard could show that under these circumstances her Section 72 leave was an adverse employment action, her retaliation claim would still fail because she cannot show that NYSED's legitimate, nonretaliatory reasons for placing her on Section 72 leave were pretextual. <u>Mitchell v. St. Univ. of N.Y. (SUNY) Upstate Med. Univ.</u>, No. 14-CV-701, 2017 WL 1047336, at *20–21 (N.D.N.Y. Mar. 17, 2017).

### 2. *Causation*

Howard argues that she has satisfied the causation prong via temporal proximity. Resp. at 13. Because it is well established that "a court may simply assume that a plaintiff has established a prima facie case and skip to the final step" of showing pretext, <u>Howard</u>, 866 F. Supp. 2d at 205, the Court will assume that Howard has made out a prima facie case and move on to consider NYSED's legitimate, nonretaliatory reason and Howard's attempt to show pretext.

16

### 3.  Legitimate, Nonretaliatory Reason and Pretext

NYSED has provided a legitimate, nonretaliatory reason for placing Howard on

leave—she was behaving erratically and acting aggressively toward coworkers. Def. Mem. at 21.

A plaintiff may show pretext by pointing to "weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons

for its action." Zann Kwan v. Andalex Grp., 737 F.3d 834, 846 (2d Cir. 2013). But "in order to

infer pretext for a retaliatory motive from multiple justifications, a defendant's nonretaliatory

justifications must be not merely different, but inconsistent with one another." Richardson v.

Bronx Lebanon Hosp., No. 11-CV-9095, 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014)

(collecting cases); see also Irons v. Bedford Stuyvesant Cmty. Legal Servs., No. 13-CV-4467,

2015 WL 5692860, at *30 (E.D.N.Y. Sept. 28, 2015) ("As these varied explanations for

Plaintiffs' selection for termination are not contradictory, this . . . fails to raise a question of fact

as to whether Defendants would not have terminated Plaintiffs but for their retaliatory motives.").

Additionally, "[a]n employer's reason for an adverse action cannot be proven to be a

pretext for retaliation unless it is shown to be false and that retaliation was the real reason."

Hexemer v. Gen. Elec. Co., No. 12-CV-1808, 2015 WL 3948418, at *9 (N.D.N.Y. June 29,

2015) (Kahn, J.) (citing Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995)). Moreover,

"[i]n order to succeed on a retaliation claim after a defendant has established a legitimate,

non-discriminatory reason for the adverse action, the plaintiff must present evidence that

retaliation was the 'but-for' cause of the action." Varno v. Canfield, 664 F. App'x 63, 66 (2d Cir.

2016) (citing Univ of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)) "'[B]ut-for'

causation does not require proof that retaliation was the only cause of the employer's action, but

only that the adverse action would not have occurred in the absence of the retaliatory motive."
Zann Kwan, 737 F.3d at 846.

Here, Howard has failed to present enough evidence to allow a reasonable jury to find that but for the protected activity, she would not have experienced any adverse employment actions. Further, the alleged weaknesses and inconsistencies she points to are not sufficient to demonstrate pretext. See Flemming v. MaxMara USA, Inc., 371 F. App'x 115, 117–18 (2d Cir. 2010) (noting that plaintiff's "disagreement with defendants over whether her behavior was inappropriate does not show that their stated reasons for terminating her were not their true reasons"); Mello v. Siena Coll., 15-CV-13, 2017 WL 1013077, at *17 (N.D.N.Y. Mar. 14, 2017) (finding that a plaintiff's assertion that defendant was wrong about her poor performance was not sufficient to show pretext); Rodriguez v. City of New York, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.").

Howard accuses NYSED of padding her personnel file by mischaracterizing and exaggerating work-related incidents. Resp. at 6. But even taking Howard's description of these events as true, she unarguably still acted inappropriately on several occasions, and her behavior fully justified NYSED's decision to place her on leave. Intervening casual events that occur after the protected activity but before the adverse employment action remove any inference of causation where the intervening event would have been good cause for the adverse employment action. Hahn v. Bank of Am. Inc., No. 12-CV-4151, 2014 WL 1285421, at *19 (S.D.N.Y. Mar.

31, 2014), aff'd, 607 F. App'x 55 (2d Cir. 2015). In this case, Howard was responsible for
multiple incidents that plainly justified placing her on leave.

First, Howard asserts that her behavior during the school observation visit was
appropriate given the School's violations of testing requirements, and that NYSED therefore
exaggerated the incident. Pl. Decl. ¶ 30. But Howard has not adequately disputed that she arrived
at the school without TSU identification and gained access to the school by providing a driver
license. Tario Decl. Ex. B, at 1–2; Pl. Decl. ¶¶ 29–30. And even if Howard were behaving
appropriately in light of the school's violations, she does not dispute that her behavior frightened
the students. Pl. Decl. ¶¶ 29–30.

Next, Howard argues that the injuries that caused her to miss work were real and that
Director Sciocchetti wrongly accused her of faking them to get out of work. Resp. at 14. But
even if Howard's injuries were real, she fails to dispute that she packed up her entire desk and
then left early on a Friday and failed to report to work the following week without informing her
employer. Def. SMF ¶ 82; Pl. SMF ¶ 82; Pl. Decl. ¶ 26. Notably, the medical records Howard
provides to prove that her injuries were real corroborate Director Sciocchetti's time line of
events. Medical Records at 10. The doctor's note shows that Howard admitted to being out of
work since Friday when she went to see the doctor the following Wednesday. Id.

Lastly, Howard concedes that she yelled at her colleague, Kristen Little, but she stresses
that Little shouted at her as well and yet did not receive any discipline. Resp. at 6. This argument
lacks merit for two reasons. First, this incident was the final straw after five months of Howard's
inappropriate behavior, and there is no evidence that Little ever engaged in similar behavior. Def.
Mem. at 12, 20–21. Thus, while evidence of disparate treatment of similarly situated people can

show retaliatory intent, Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000), Little

and Howard are not similarly situated. Second, even if Howard and Little were equally at fault

for the shouting match, the mere fact that Howard engaged in shouting at all is a nonretaliatory

reason for the adverse employment action. See Rumsey v. Ne. Health, Inc., 89 F. Supp. 3d 316,

339 (N.D.N.Y. 2015) ("Regardless of the intensity of the disagreement, . . . the disagreement is a

non-retaliatory basis for terminating plaintiff's employment."); Joseph v. Owens & Minor

Distribution, Inc., 5 F. Supp. 3d 295, 319–20 (E.D.N.Y. 2014) (noting that the fact that the

plaintiff was not responsible for a disagreement "does not establish that Defendant was

retaliating against Plaintiff when it terminated Plaintiff over the disagreement with the customer

since, regardless of who was responsible for the disagreement, the disagreement itself is a

non-retaliatory basis for terminating Plaintiff"), aff'd, 594 F. App'x 29 (2d Cir. 2015).

In addition to the disputed incidents above, there were many other incidents that Howard

has not disputed at all. This includes informing Allison, an HR representative, that she wanted to

file a restraining order against her supervisor Gretschel, even though Howard said that she did

not fear for her safety. Def. SMF ¶¶ 89–90; Pl. SMF ¶¶ 89–90. Howard later called the police to

the HR office to file a complaint against Gretschel because she was not satisfied with the result

of her meeting with Wieske, an HR representative. Pl. Decl. ¶ 27; Wieske Decl. Ex. A, at 1, 3, 6.

Finally, Howard has not disputed that she snuck into Director Sciocchetti's office and made a

photocopy of a personal photo she found there. Sciocchetti Decl. ¶ 23. Even viewing the facts in

the light most favorable to Howard, she has been combative with multiple coworkers, invaded

her supervisor's privacy, failed to report to work without explanation, and behaved improperly

while carrying out her professional duties. Howard has not offered any evidence allowing a

reasonable jury to conclude that but for the protected activity, she would not have been placed on leave. Ultimately, Howard has failed to create a genuine issue of material fact as to whether NYSED's legitimate, nonretaliatory explanation for its decision to place her on involuntary leave is a pretext for retaliation.[4]

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that NYSED's Motion for Summary Judgment (Dkt. No. 35) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    July 28, 2017
           Albany, New York


Lawrence E. Kahn
U.S. District Judge

---

[4]  NYSED has not consented to suit in federal court, and therefore has Eleventh Amendment immunity against Plaintiff's § 1981 and NYSHRL law claims. Posr v. Court Officer Sheild No. 207, 180 F.3d 409, 414 (2d Cir. 1999); Jackson v. Battaglia, 63 F. Supp. 3d 214, 220 (N.D.N.Y. 2014). For that reason, the Court grants NYSED's Motion with regard to those claims.